# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 5, 2006 Session

## GEORGE HASKEL STEWART v. DEMPLE L. SEWELL ET AL.

**Appeal by permission from the Court of Appeals, Middle Section**
**Chancery Court for Franklin County**
**No. 15,704    Buddy D. Perry, Judge**

---

**No. M2003-01031-SC-R11-CV- Filed on February 28, 2007**

---

We granted this appeal to clarify the applicability of the rule of ademption by extinction and of Tennessee Code Annotated section 32-3-111 concerning the sale of specifically devised property. In August 1994, the decedent Clara Stewart executed her last will and testament in which she left a parcel of real estate to her stepson, the plaintiff in this matter. In November 1994, the decedent executed a durable power of attorney to her natural children, defendants Sewell and Judkins. In January 1997, the decedent's health had so far deteriorated that she required placement in a nursing home. In February 1997, Sewell and Judkins sold a portion of the devised real estate in order to fund the decedent's nursing home expenses. After their mother's death, Sewell and Judkins inherited the remaining proceeds of the sale; the plaintiff inherited that portion of the real estate which had not been sold. Plaintiff sued Sewell and Judkins as well as the purchasers of the real estate, alleging fraud. After a trial, the trial court dismissed the plaintiff's complaint. On appeal, the Court of Appeals determined that Sewell and Judkins had acted improperly and granted the plaintiff relief. We granted the defendants' application for permission to appeal and hold that the specific devise of the real property was adeemed by extinction and that the Court of Appeals erred in applying retroactively Tennessee Code Annotated section 32-3-111 and in imposing a constructive trust in order to avoid that result. Accordingly, we reverse the judgment of the Court of Appeals and reinstate the trial court's judgment dismissing the plaintiff's case.

### Tenn. R. App. P. 11 Appeal by Permission;
### Judgment of the Court of Appeals Reversed

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER and GARY R. WADE, JJ., and ADOLPHO A. BIRCH, JR., SP.J., joined.

Jerre M. Hood, Winchester, Tennessee, for the appellants, Demple L. Sewell and Bobby L. Judkins.

Mark Stewart, Winchester, Tennessee, for the appellee George Haskel Stewart.

1

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

This case involves a dispute between the decedent Clara Stewart's natural children, defendants Demple Sewell and Bobby Judkins, and her stepson, plaintiff George Stewart, over the sale of a parcel of real estate originally owned by Stewart's father and devised to Stewart under Clara Stewart's will.[1]

James Stewart and Clara Judkins, whose first spouses had died, married in 1974. They lived together in a house near Tim's Ford Lake that James had owned prior to this second marriage. They rented out the house in Winchester in which Clara had lived with her first husband. During their marriage, Clara and James each executed wills leaving all their property to the other spouse if he or she survived. If the spouse did not survive, then each left the property previously owned by the spouse to the spouse's adult child or children, and left all remaining property to their own child or children.[2]

James Stewart died in 1981, and Clara inherited the Tim's Ford Lake property in fee simple. This property included the house and approximately seven acres. Clara continued to live there until 1992, when she moved back to her old home in Winchester. She thereafter leased the Tim's Ford Lake house to a tenant who paid several hundred dollars a month in rent. In August 1994, soon after the death of one of her three adult children, Clara executed a new last will and testament, in which she again devised to George Stewart the Tim's Ford Lake property. Clara's two living children, Sewell and Judkins, were the remainder beneficiaries under Clara's new will, with the only specific bequest being of the Tim's Ford Lake property.

On November 7, 1994, Clara executed a durable power of attorney ("the POA") in which she named Sewell and Judkins her attorneys-in-fact. The POA provides that it "shall not be affected by [Clara's] subsequent disability or incapacity and is made pursuant to the Uniform Power of Attorney Act as codified in Tennessee Code Annotated, Section, 34-6-101, et. seq." The POA also specifically gave Sewell and Judkins "the right . . . to buy and sell both real and personal property on [Clara's] behalf to the full extent as if [she] transacted the sale or purchase in person. This shall specifically include the right and power to execute deeds and other instruments conveying personal and real property."

In late December 1996, Sewell found her mother in a coma. Clara was taken to the hospital. In mid-January 1997, after she had come out of the coma, Clara was transferred to Mountain View Nursing Home. Clara remained at the nursing home until her death on May 9, 1998.

---

[1]The Court of Appeals described this realty as including "260 feet [of] valuable lakefront property." The record makes clear, however, that none of this property had shoreline, although it did have a view of the lake.

[2]Although the plaintiff George Stewart refers to these as "mutual" wills, no proof in the record supports this allegation. Clara Stewart's 1974 will is not contained in the record. No party contests the validity of her 1994 will.

In January 1997, Sewell obtained an appraisal of the undeveloped acreage included in the Tim's Ford Lake property ("the Undeveloped Tract"). The appraisal describes the Undeveloped Tract as including approximately five acres and a small barn and indicates an estimated value of $110,000. Sewell also obtained an appraisal of the house and one acre remaining in the Tim's Ford Lake property. The appraised value on that tract was $64,000.

After receiving the appraisals, Sewell contacted Stewart through attorney Clinton Swafford to inquire whether he would like to purchase the Undeveloped Tract for $110,000. Stewart declined because he believed he was entitled to receive the parcel by bequest. Sewell subsequently sold the Undeveloped Tract, which actually included approximately six acres, to her daughter and son-in-law and their friends Mr. and Mrs. Blocker for $80,000. Sewell testified that she negotiated the price for the Undeveloped Tract, taking into consideration the expenses required to develop an access road and to extend utilities. She stated that $80,000 was the best offer she got on the Undeveloped Tract after offering it to several members of her family, including Stewart. Sewell did not list the Undeveloped Tract with a broker or otherwise advertise it prior to selling it.

Sewell testified that she took the proceeds from the sale of the Undeveloped Tract and invested it in several certificates of deposit through the credit union. She explained that her mother had been diagnosed with Alzheimer's disease and she "tried to figure out by the length of time other Alzheimer's patients were being kept in the nursing home, how long [she] could stretch the money out." Sewell testified that her mother's monthly bills at the nursing home were "always at least $3,000 plus her supplies, plus her medicines." Sewell acknowledged that, after her mother died, the money remaining in these certificates was divided between her and Judkins, her brother. In other words, Sewell admitted that she and her brother eventually benefitted personally from the sale of the Undeveloped Tract because they kept the proceeds remaining upon their mother's death. Sewell testified that she "did not think" about borrowing money against the Tim's Ford Lake property instead of selling a portion of it.

After Clara died, attorney Swafford advised Stewart that he had inherited the house and one remaining acre overlooking Tim's Ford Lake and mailed him the key to the house.

Stewart testified that he grew up on the Tim's Ford Lake property and that he knew Clara intended to leave him that property upon her death. He acknowledged that an attorney representing Sewell called him in late January or early February 1997 and asked him if he wanted to buy the Undeveloped Tract for the appraised price of $110,000. Stewart testified that he told the lawyer he did not want to buy the Undeveloped Tract because he "felt that [he] should have inherited that piece of property." He also stated that he never had any conversations with Sewell or Judkins about Clara's care or the need for money to pay for her care. Stewart acknowledged, however, receiving a telephone call from a lawyer regarding the need to raise money for Clara's nursing home care. He did not learn what had happened with the Undeveloped Tract until he received a letter from the attorney together with the key to the house in June 1998. His last visit with Clara was in 1992.

In addition to a transcript of the witnesses' testimony, the record includes extensive documentation concerning Clara's finances.[3] Chronologically, the documentary record begins with a January 1994 bank statement on checking account number -7281. Both Clara and Sewell had signing authority on this account. The record includes statements on this account from January 1994 through September 1996. All of the checks included with these statements were signed by Sewell, who testified that even before Clara's decline in health, she preferred to have her daughter write checks and take care of business for her.

On June 26, 1996, a twelve-month certificate of deposit in the amount of $25,807.45 was obtained, payable to "Clara B. Stewart or Demple Sewell." The documentary record does not disclose the source of the funds for this certificate. The record indicates that this certificate of deposit was later "closed" but does not indicate when.

In September 1996, checking account number -7281 was closed and checking account number -3496 was opened with an initial deposit of $1,063.70 (the closing balance of -7281 was $863.70). This account bore the names of "Clara B. Stewart or Demple L. Sewell or Bobby L. Judkins." The record includes copies of the statements on this account from October 1996 through April 1997. All but one of the checks included with the statements bear Sewell's signature (the other one bears Judkins' signature).

On November 21, 1996, a deposit in the amount of $26,130.15 was made into checking account number -3496. Although the record does not make clear the source of this deposit, a logical inference is that it resulted from redeeming the June 1996 certificate of deposit.[4] On November 27, 1996, a check in the amount of $19,957.13 was made payable to the investment firm J.C. Bradford. Sewell testified that she invested this money in her and Judkins' names at her mother's direction. Sewell explained that her mother had been saving this money for her children for many years.

In February 1997, after Clara entered the nursing home, Sewell opened a new account at the credit union in the names of "Clara B. Stewart, Demple L. Sewell, Bobby L. Judkins." Sewell testified that she set the account up in all three names "so that if anything happened to us [Clara] wouldn't be . . . [unable] to get it." Sewell subsequently deposited $75,000 from the sale of the Property into this account as well as approximately $6,500 after closing checking account number -3496.[5] Clara's social security and rental income checks totaling approximately $1,100 per month were also deposited into this account. The March 31, 1997, balance in this account was approximately $82,500.

---

[3]Although the parties alluded at trial to lengthy deposition testimony about Clara's finances, the depositions were not made part of the record and the questions were not repeated at trial. Similarly, an affidavit filed by Sewell as part of her petition to rehear before the Court of Appeals is not a formal part of the record. Thus, our information about Clara's finances derives from our painstaking review of Collective Exhibit 18.

[4]The relevant checking account statement includes the handwritten notation "CD in & out."

[5]The record suggests that $4,000 from the sale of the Undeveloped Tract was deposited into account -3496 in February 1997.

On May 30, 1997, Sewell issued a check to Mountain View Nursing Home in the amount of $5,766.74 from the credit union account. Additional checks from this account were paid to the nursing home on a monthly basis through June 1998. The checks from May 1997 through June 1998 total more than $40,000. Checks totaling approximately $2,200 were issued to a pharmacy from this account during the same period. At the time Clara died, the credit union account balance was approximately $51,500.

In October 1998, Stewart filed a complaint against Sewell, Judkins, and the four purchasers of the Undeveloped Tract. Stewart alleged, among other things, that Sewell and Judkins "fraudulently conveyed their mother's property to keep [Stewart] from inheriting said property." In his prayer for relief, Stewart requested that the court "find that a fraud has been committed on both the Estate of Clara B. Stewart and upon the Plaintiff, George Haskel Stewart," that the court void the deed by which Sewell and Judkins conveyed the Undeveloped Tract, and that the Undeveloped Tract be conveyed to him. In the alternative, Stewart requested damages "in a sum not to exceed $400,000." At the end of the trial, plaintiff's counsel moved the court to amend the complaint to conform with the evidence. After considering the evidence summarized above, the trial court entered an order dismissing the complaint on the basis that "the allegations and legal theories set forth in plaintiff's Complaint are not sustained by the proof." Unfortunately, the trial court made no specific findings of fact.

On appeal, the Court of Appeals reversed the trial court and awarded Stewart a judgment against Sewell and Judkins.[6] The Court of Appeals determined that Sewell and Judkins "acted in contravention of the power of attorney and the limitations imposed under Tenn. Code Ann. § 34-6-108(c)(1) and (6) and breached their fiduciary duties." The Court of Appeals determined that the rule of ademption by extinction did not apply in this case, applied the provisions of Tennessee Code Annotated section 32-3-111, and imposed a constructive trust on the proceeds resulting from the sale of the Undeveloped Tract in order to award Stewart a judgment "in the amount of the net proceeds resulting from the sale of the devised property plus pre-judgment interest computed from the date of sale of the devised property."[7] Because the Court of Appeals based these determinations on erroneous findings of fact, and because the intermediate appellate court crafted its remedy in part upon the provisions of an inapplicable statute, we reverse.

## STANDARD OF REVIEW

Tennessee Rule of Appellate Procedure 13(d) provides that, "[u]nless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding[s], unless the preponderance of the evidence is otherwise." When the trial court fails to make specific findings of fact, however, this Court reviews the record to determine the facts as established by the

---

[6]The Court of Appeals affirmed the trial court's dismissal of the complaint as to the four purchasers of the Undeveloped Tract.

[7]On appeal Stewart continues to ask that the sale be voided and the Undeveloped Tract be deeded to him.

5

preponderance of the evidence.  Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997).  Our scope of review for questions of law is de novo upon the trial court's record with no presumption of correctness.  Id.

## ANALYSIS

### I.  Factual Findings

The Court of Appeals found several facts to be significantly different from those recited above, or drew different inferences therefrom.  Our careful examination of the record belies those findings.

### A.  The "$19,500 Gift"

The Court of Appeals found that "[a]s the Fiduciaries [Sewell and Judkins] were preparing to move Mrs. Stewart into the nursing home in December of 1996 and January of 1997, the Fiduciaries received a $19,500 'gift' from Mrs. Stewart's bank account."  This reference is to the $19,957.13 check written on account number -3496 and invested with J.C. Bradford in Sewell's and Judkins' names.  Apparently, the intermediate appellate court was of the opinion that this money should have been available to pay for Clara's care.  The Court of Appeals described this transfer as having been made as Sewell and Judkins "were preparing to move [their mother] into the nursing home."  The record indicates, however, that the transfer of funds took place in November 1996, approximately a month before Sewell found her mother in a coma and before the need to pay for nursing home care existed.  Sewell explained that her mother had requested this transfer of money to be made and that her mother had been saving this money for her children for many years.  No proof in the record contradicts this testimony.  Moreover, the documents before us compel the inference that the transfer was made from funds that had been held jointly by Sewell and Clara in a certificate of deposit.

### B.  The Credit Union Account

Sewell opened an account at the credit union in February 1997.  The account was listed in the names of Clara, Sewell, and Judkins.  Seventy-five thousand dollars from the sale of the Undeveloped Tract was deposited into the account along with $6,517.47,  the balance of the checking account previously held at a bank.  Clara's social security and rental income checks totaling approximately $1,100 per month were also deposited into this account.  The deposits into this account were, so far as the record indicates, the sole source of Clara's liquid assets to pay for her care.

The Court of Appeals emphasized the fact that Sewell and Judkins placed the proceeds from the sale of the Undeveloped Tract into an account bearing their names along with that of their mother:

6

> While [Sewell and Judkins] had the authority, assuming it was in Mrs. Stewart's best interest, to sell the property, they had a corresponding duty to invest the proceeds in assets or accounts solely in the name of Mrs. Stewart because the property was titled solely in her name when it was sold. Accordingly, [Sewell and Judkins] acted in direct contravention of the power of attorney and Tenn. Code Ann. § 34-6-108(c)(1) and (6) by depositing the proceeds in a series of certificates of deposit with themselves identified as co-owners and with right of survivorship upon the death of Mrs. Stewart.

However, Sewell testified that she set the account up in all three names "so that if anything happened to us she wouldn't be . . . [unable] to get it." Given that Clara's previous checking account was also in the names of all three people, Sewell's explanation for her handling of the proceeds is consistent with the way she had helped her mother handle her finances prior to her final illness.[8] Given that there is no proof that any of the proceeds from the sale of the Undeveloped Tract was used for an improper purpose while Clara remained alive, we disagree with the Court of Appeals that Sewell and Judkins acted "in direct contravention" of their duties and obligations under the POA so as to be in breach of their fiduciary duties thereunder. Rather, upon our close review of all of the evidence, we are convinced that Sewell and Judkins would have continued to use the proceeds from the sale of the Undeveloped Tract for their mother's benefit for so long as she remained alive. The Court of Appeals' conclusion that Sewell and Judkins sold the Undeveloped Tract in order to benefit themselves is not supported by a preponderance of the evidence.

## C. Payments for Clara's Care

The Court of Appeals also concluded that the proceeds from the sale of the Undeveloped Tract "were never used for [Clara] Stewart's benefit because other assets were sufficient to provide for her care and nursing home expenses." As set forth above, this conclusion is not supported by the record. By the time Clara died, over $42,000 had been paid from the credit union account to the nursing home and the pharmacy for her care: over half of the amounts initially deposited and available. The record contains no indication that any of the money in this account was used for inappropriate purposes. At the time Clara died in May 1998, the balance in the account was approximately $51,500. Obviously, a significant portion of the proceeds from the sale of the Undeveloped Tract was used for Clara's care and expenses.

## D. TennCare Fraud

The Court of Appeals suggested that Sewell and Judkins sold the Undeveloped Tract to prevent the property from "going to the nursing home." In fact, the court went further, concluding that

---

[8]We note the dangers of attorneys-in-fact conducting business on behalf of the grantor without a full and precise understanding of the legal ramifications and implications of their actions.

the Fiduciaries [Sewell and Judkins] intentionally used the power of attorney to benefit themselves by gifting the proceeds from the sale of the disputed property to themselves. Moreover, the Fiduciaries' actions exposed Mrs. Stewart to various liabilities for potential fraud upon the Medicaid and TennCare programs. Such actions constitute serious violations of the Fiduciaries' duties to exercise the utmost good faith, loyalty and honesty toward Mrs. Stewart. Thus, we hold that the Fiduciaries, Demple Sewell and Robert Judkins violated their confidential relationship and breached their fiduciary duties owing to Mrs. Stewart when they established the certificates of deposit.

We disagree with the Court of Appeals' conclusion that Sewell and Judkins exposed their mother to allegations of Medicaid and TennCare fraud.[9] The Court of Appeals may have been influenced by Sewell's admission that, when asked by the nursing home for a list of Clara's assets other than her home, an automobile, and $2,000, Sewell and Judkins declined to provide the list because they "were trying to save some portion."[10] However, the evidence in the record establishes that all of Clara's expenses during her sixteen months at the nursing home, and all of her pharmacy expenses, were paid for with her own assets, including the proceeds from the sale of the Undeveloped Tract.[11] There is no evidence that TennCare/Medicaid was defrauded into providing for Clara's healthcare.

## E. Purchase Price for Undeveloped Tract

The Court of Appeals found "questionable" and "suspicious" the fact that Sewell and Judkins, without the assistance of a real estate agent and without offering it for sale to the general public, sold the Undeveloped Tract to one of their children, her spouse, and friends, at a price 30% below the appraised value and at a time when there was no pressing need to liquidate Clara's assets because she had "ample cash assets" to pay for her needs, including nursing home expenses. As noted above, however, the assumptions made by the Court of Appeals are not supported by a

---

[9]In fact, Sewell and Judkins could not be guilty of defrauding *both* TennCare and Medicaid because, in Tennessee, TennCare takes the place of Medicaid. See generally the "Medical Assistance Act of 1968," Tenn. Code Ann. §§ 71-5-101 to -199 (2004); River Park Hosp., Inc. v. BlueCross BlueShield of Tenn., Inc., 173 S.W.3d 43, 47 (Tenn. Ct. App. 2002) ("TennCare *is* Tennessee's Medicaid program.") (emphasis added). The federal government established Medicaid in 1965 to provide health coverage for low-income individuals. See River Park Hosp., 173 S.W.3d at 47. The state of Tennessee was then permitted to create a managed care system to meet its obligations under the federal program. See Jones v. Bureau of TennCare, 94 S.W.3d 495, 502 (Tenn. Ct. App. 2002) ("Tennessee has elected to participate in Medicaid under Title XIX of the Social Security Act of 1965 and is, therefore, obligated to provide Medicaid services to qualified recipients consistent with federal law."). A recipient of TennCare benefits cannot also receive Medicaid benefits.

[10]We infer from this testimony that the nursing home had sought to determine if Clara's care would be paid for through TennCare. With certain exceptions, a TennCare recipient must have exhausted his or her assets before coverage commences. See Tenn. Code Ann. § 71-5-106 (2004). In this case, however, Clara's eligibility for TennCare benefits was moot for so long as Sewell paid for her care with Clara's assets.

[11]According to Sewell, the first 100 days of Clara's care were paid for by Medicare and an insurance policy Clara had purchased to supplement her Medicare coverage.

8

preponderance of the evidence. The discrepancy between the appraisal and the actual purchase price was reasonably explained at trial. Stewart was offered the first right to purchase the property. He, too, presumably could have made a counter-offer if he believed the initial price suggested was too high.

## F.  Absence of Total Ademption

Although the Court of Appeals acknowledged that Sewell and Judkins did not sell the entire parcel of property on Tim's Ford Lake, the intermediate appellate court seems to have underestimated the significance of that fact. If Sewell and Judkins had had any improper motive in selling the property, or wanted to maximize the benefit to themselves, they simply could have sold the entire property, thereby preventing Stewart from inheriting any of it. Instead, they took steps to sell first only the undeveloped portion, thereby preserving the family house and approximately one acre of property which Stewart did ultimately receive by devise.

## II.  Legal Conclusions

## A.  Ademption by Extinction

In In re Estate of Hume, 984 S.W.2d 602 (Tenn. 1999), this Court reiterated Tennessee's longstanding rule that a devise of specific property is extinguished upon "'the doing of some act with regard to the subject-matter [of the devise] which interferes with the operation of the will.'" Id. at 604 (quoting Am. Trust & Banking Co. v. Balfour, 198 S.W. 70, 71 (Tenn. 1917)). In these cases,

> [t]he rule [of ademption by extinction] prevails *without regard to the intention of the testator or the hardship of the case*, and is predicated upon the principle that the subject of the gift is annihilated or its condition so altered that nothing remains to which the terms of the bequest can apply.

Id. (quoting Wiggins v. Cheatham, 255 S.W. 1040, 1041 (Tenn. 1920) (emphasis added) (citation omitted)). "In other words, it only matters that the subject of the specific bequest no longer exists because of 'the doing of some act;' it is irrelevant who or what initiates 'the doing.'" Id. (quoting Balfour, 198 S.W. at 71).

In Hume, the testator had specifically devised a parcel of real estate to his niece. Prior to the testator's death, the mortgagee sold the real estate in a foreclosure sale. The mortgagee paid the surplus proceeds to the estate, the testator having since died. The niece sought to recover the surplus. This Court held that the niece was not entitled to recover the surplus because "the specific bequest of the . . . property was adeemed in its entirety by the foreclosure sale regardless of [the testator's] presumed intentions." Id. at 605. This Court emphasized that

9

the proceeds cannot be substituted for the specific bequest of the house because 'a specific legacy is adeemed when there has been a material alteration or change in the subject-matter, and . . . the property into which it was converted in such change cannot be substituted as or for the specific bequest.'

Id. (quoting Balfour, 198 S.W. at 71).

The rule that the intent of the testator is irrelevant in ademption by extinction cases is in harmony with modern holdings in the majority of states. Id. at 604-05. Among the advantages of this theory is ease of application, stability, uniformity, and predictability. Id. at 605.

In this case, the sale of the undeveloped portion of the Tim's Ford Lake property was clearly "the doing of some act with regard to the subject-matter which interfere[d] with the operation of the will." Balfour, 198 S.W. at 71. The Court of Appeals acknowledged that, under the doctrine of ademption by extinction, Clara's specific devise of the Tim's Ford Lake property to Stewart was extinguished upon the sale of the Undeveloped Tract. Under the Balfour doctrine, Stewart had no claim to the proceeds. Thus Stewart's claim was appropriately dismissed by the trial court.

The Court of Appeals sought to avoid this "harsh" result by attempting to distinguish Hume on the basis that Sewell and Judkins "acted in contravention of the power of attorney and the limitations imposed under Tenn. Code Ann. § 34-6-108(c)(1) and (6) and breached their fiduciary duties," thereby allowing the imposition of a constructive trust on the sale proceeds.

In this case, the preponderance of the evidence establishes that Sewell and Judkins acted in accordance with the duties they owed their mother as her attorneys- in-fact. They sold the Undeveloped Tract in order to fund Clara's living and healthcare expenses after she had been placed in a nursing home. In so doing, they did not act in an "unfaithful," "ultra-vires," or a "self-serving" manner. Therefore, contrary to the Court of Appeals' analysis, this case does not present a set of facts requiring an exception to the rule of law recognized in Hume. Accordingly, Sewell and Judkins' sale of the Undeveloped Tract extinguished Clara's specific devise thereof. The land sale may not be voided, and the proceeds resulting from the sale cannot be substituted. We hold, therefore, that Stewart is not entitled to the Undeveloped Tract or the proceeds of its sale.

### B. Tennessee Code Annotated section 32-3-111

After erroneously determining that the "no exceptions" rule of ademption by extinction did not apply in this case, the Court of Appeals embraced special rules adopted in other states to limit or eliminate the Balfour/Hume rule when applied to acts of a representative done after a testator's incapacity. The intermediate appellate court expressly endorsed Uniform Probate Code section 2-606, as adopted in Tennessee Code Annotated section 32-3-111. That statute provides that

10

> [i]f specifically devised or bequeathed property is sold or mortgaged by a conservator or by an agent acting within the authority of a durable power of attorney for an incapacitated principal, . . . the specific devisee has the right to a general pecuniary devise equal to the net sale price . . . .

Tenn. Code Ann. § 32-3-111(b) (Supp. 2004). Using this statute, the Court of Appeals found Stewart had the right to recover from Sewell and Judkins "the general pecuniary devise equal to the net sale price [of the property]." This statute did not take effect, however, until June 8, 2004. See 2004 Tenn. Pub. Acts 1977-78. Clara died in 1998.

Tennessee's Constitution provides that "no retrospective law, or law impairing the obligations of contracts, shall be made." Tenn. Const. art. I, § 20. This Court has stated that "[s]tatutes are presumed to operate prospectively unless the legislature clearly indicates otherwise." Nutt v. Champion Int'l Corp., 980 S.W.2d 365, 368 (Tenn. 1998). Moreover, while statutes which are "remedial or procedural" can apply retrospectively, statutes cannot be applied to disturb vested rights. See Kuykendall v. Wheeler, 890 S.W.2d 785, 787 (Tenn. 1994).

"[T]he law in effect when the testator dies controls all substantive rights in the estate, whether vested or inchoate." Fell v. Rambo, 36 S.W.3d 837, 845 (Tenn. Ct. App. 2000) (citing Marler v. Claunch, 430 S.W.2d 452, 454 (Tenn. 1968)). At the time Clara died, Tennessee Code Annotated section 32-3-111 was not in effect. Nothing in the language of the statute indicates that the legislature intended it to apply retroactively. Accordingly, under the rule of law we recognized in Hume, Clara's specific bequest of the Tim's Ford Lake property to Stewart was adeemed by extinction upon the sale of the Undeveloped Tract in 1997. Sewell's and Judkins' rights to inherit pursuant to Clara's will vested upon her death and entitled them to inherit what remained in Clara's credit union account. Those vested rights cannot be disturbed by the retroactive application of Tennessee Code Annotated section 32-3-111.

## C. Constructive Trust

The Court of Appeals determined that, because Sewell and Judkins breached their fiduciary duties as attorneys-in-fact for their mother, a constructive trust should be imposed on the proceeds from the sale of the Undeveloped Tract for the benefit of Stewart. We disagree.

This Court has previously recognized that a constructive trust may be imposed where, for example, a person (1) obtains legal title to property in violation of some duty owed the owner of the property; (2) obtains title to property by fraud, duress, or other inequitable means; (3) makes use of a confidential relationship or undue influence to obtain title to property upon more advantageous terms than would otherwise have been obtained; or (4) obtains property with notice that someone else is entitled to the property's benefits. See Tanner v. Tanner, 698 S.W.2d 342, 345-46 (Tenn. 1985). In this case, the Court of Appeals imposed a constructive trust upon the proceeds from the sale of the Undeveloped Tract on the basis that Sewell and Judkins "unlawfully transferred the proceeds from the sale of the devised property to themselves." In so doing, the Court of Appeals held that self-serving ultra vires actions by an unfaithful fiduciary create an exception to the Hume

11

"no exceptions" doctrine of ademption by extinction. However, as noted previously, the intermediate appellate court erred in its factual findings.[12]

Sewell and Judkins sold the Undeveloped Tract, which was owned solely by Clara, and placed the proceeds from the sale into a credit union account bearing all three of their names. We agree that Sewell and Judkins did not have the authority under the POA to place the proceeds from the sale of the Undeveloped Tract into an account bearing their names. See Tenn. Code Ann. § 34-6-108(c)(1), (c)(6) (2001).[13] Sewell testified that this was done so that Clara would still have access to the proceeds in the event anything happened to Sewell and Judkins. No evidence in the record contradicts this testimony.[14] Clara's previous checking account had been in all three names, so Sewell was familiar with this manner of handling her mother's finances. Furthermore, there is no evidence in the record that either Sewell or Judkins made any improper use of the proceeds. Rather, the evidence demonstrates that the proceeds were used to fund Clara's living and healthcare expenses, which exceeded $3,000 per month, from her move to the nursing home in January 1997 until her death in May 1998. Thus, while adding their names to the account was improper, no improper use of the proceeds occurred. And because the original bequest was partially adeemed by the sale of the Undeveloped Tract, Stewart had no interest in the proceeds.

Had Sewell and Judkins taken the proceeds from the sale of the Undeveloped Tract, placed them into a joint account, and then absconded with the proceeds, we might agree with the Court of Appeals that they had thereby breached the fiduciary duty they owed Clara.[15] That is not what they did, however. Our close examination of the record reveals that the proceeds from the sale of the Undeveloped Tract funded the account from which Clara's healthcare expenses were paid. There is no indication that Sewell and Judkins used any of the proceeds for an improper purpose while their mother remained alive.

In short, the evidence does not establish that Sewell and Judkins "unlawfully transferred the proceeds from the sale of the devised property to themselves." Nor does the evidence support any of the grounds necessary for the imposition of a constructive trust. Finally, the duty owed by Sewell and Judkins was to Clara, not Stewart. Any constructive trust arising from a breach of that duty would therefore be for the benefit of Clara or her estate, not Stewart. The Court of Appeals'

---

[12]Because we find the Court of Appeals erred in its factual findings, it is not necessary to consider whether the legal distinction asserted by the intermediate appellate court can ever exist.

[13]A power of attorney incorporating the statutory powers contained in Tennessee Code Annotated section 34-6-109, as did the POA, may not be construed to authorize the attorney-in-fact to "[m]ake gifts, grants, or other transfers without consideration, except in fulfillment of charitable pledges made by the principal while competent," Tenn. Code Ann. § 34-6-108(c)(1) (2001), or to "[c]hange, add or delete any right of survivorship designation on any property, real or personal, to which the principal holds title, alone or with others," id. at (c)(6).

[14]We acknowledge, however, that Sewell's and Judkins' names did not have to be on Clara's account for Clara to have access to the funds therein.

[15]Whether such a breach would inure to Stewart's benefit is doubtful under Hume.

imposition of a constructive trust for the benefit of Stewart implicitly embraced the tort of intentional interference with an inheritance or gift. Tennessee does not, however, recognize that tortious cause of action. See Fell, 36 S.W.3d at 849-50. Accordingly, the Court of Appeals erred in imposing a constructive trust upon the proceeds from the sale of the Undeveloped Tract.

## CONCLUSION

Upon our close and careful review of the record in this case, we have determined that the evidence preponderates in favor of the trial court's judgment that Stewart failed to establish any unlawful conduct on the part of the defendants Sewell and Judkins stemming from their sale of the Undeveloped Tract pursuant to the POA. The Court of Appeals erred in distinguishing this case from the rule of ademption by extinction set forth in Hume, in retroactively applying Tennessee Code Annotated section 32-3-111, and in imposing a constructive trust on the proceeds of the sale of the Undeveloped Tract. Accordingly, we reverse the judgment of the Court of Appeals as to Sewell and Judkins and reinstate the judgment of the trial court dismissing the action against all defendants. The costs of this cause are assessed against the plaintiff George Haskell Stewart and his sureties, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE