IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS NOVEMBER 21, 2007

JESSIE DAVIS, ET AL. v. FORD MOTOR COMPANY

Direct Appeal from the Circuit Court for Shelby County
No. CT-003945-04      Donna Fields, Judge

No. W2007-01226-COA-R3-CV - Filed March 14, 2008

This case involves a claim for breach of warranty. The plaintiff purchased a used Ford from a GMC dealership. The truck came with Ford's bumper to bumper limited warranty. The warranty specifically excluded from coverage any damage caused by after-market components and/or non-Ford components. Unbeknownst to the plaintiff, the truck had three after-market modifications: a "super chip," a "K& N" air filter, and a "Magnaflow " muffler. The plaintiff began experiencing oil consumption problems and trouble with the engine. He took the vehicle to several Ford dealerships for repair. One dealership service department recommended replacing the engine of the truck, but Ford denied warranty coverage, pointing to the after-market modifications as the cause of the truck's problems. The plaintiff sent Ford a letter of revocation of acceptance, and thereafter filed suit alleging several claims, including breach of warranty and a claim under the Magnuson-Moss Warranty Act. A bench trial was held, and the court ruled in favor of Ford on all claims. The plaintiff appeals, and we affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Ronald C. Wilson, West Memphis, AR, for Appellant

Prince C. Chambliss, Jr., Memphis, TN, for Appellee

OPINION

## I.  FACTS & PROCEDURAL HISTORY

Jessie Davis ("Appellant") and his wife, Jocelyn Davis, purchased a used 2001 Ford F-150 Lightning pick-up truck in August of 2002.  Mr. Davis purchased the truck from Sunrise Pontiac GMC in Memphis, TN, for approximately $40,000.  Sunrise Pontiac GMC is a used car dealership and is not an authorized Ford Motor Company dealership.  Mr. Davis purchased the truck upon first sight, without test driving the vehicle or inquiring as to any modifications the vehicle might have undergone in the past.  Unbeknownst to Mr. Davis, the vehicle had three "after-market" modifications and/or non-Ford parts installed by a previous owner: a "super chip," a K&N air filtration system, and a Magnaflow muffler.

When purchased, the truck had around 9,000 miles on it, and was still under  Ford Motor Company's ("Ford" or "Appellee") manufacturer's warranty.  The warranty was an express "bumper to bumper" limited warranty on parts and workmanship.   The warranty provided coverage on the vehicle for the first three years or the first 36,000 miles, and thus, the truck was still covered.  The warranty provided that during the coverage period, "authorized Ford Motor Company dealers will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."   The warranty had specific exclusions, including the following:

> **WHAT IS NOT COVERED?**
> **Damage Caused By:**
> . . .
> •     altering or modifying the vehicle - including the body, chassis, or components - after the vehicle leaves Ford's control
> •     non-Ford parts installed after the vehicle leaves Ford's control.  For example, but not limited to, cellular phones, alarm systems, and automatic starting systems
> •     tampering with the vehicle, tampering with the emissions systems, or with other parts that affect these systems
> . . .
> •     using contaminated or improper fuel/fluids
> . . .
>
> **Damage Caused by Improper Maintenance**
>
> Your New Vehicle Limited Warranty does not cover damage caused by failure to maintain the vehicle, improperly maintaining the vehicle, or using the wrong part, fuel, oil, lubricants, or fluids.  See the **Owner Guide** for correct fluid types and levels, and consult the **Scheduled Maintenance Guide** for proper ways to maintain your vehicle.

The Owner Guide and the Scheduled Maintenance Guide came with the truck when purchased.

Mr. Davis began experiencing problems with the truck engine and with excessive oil consumption around July of 2003, so he took the truck to the service department of Wood Ford Sales, Inc., an authorized Ford dealer located in Truman, Arkansas. At this point, the truck had 21,861 miles and was still covered by the aforementioned warranty. Wood Ford made several unsuccessful attempts to repair the vehicle.

Mr. Davis then took the truck to Blackwell Baldwin Ford located in Jonesboro, Arkansas. Blackwell Baldwin Ford performed a borescope test on the truck and found "possible damage to the cylinder." The Blackwell Baldwin Ford recommended that the engine be replaced and estimated the cost at $3,600. Blackwell Baldwin Ford submitted a claim for warranty coverage for the replacement of the engine to Ford. Ford sent a technician to inspect the truck, in which the after-market super chip was discovered. Ford denied coverage.

Mr. Davis nevertheless continued driving the truck, despite having to add four quarts of oil around every 3,000 miles. Mr. Davis sent Ford a letter of "NOTICE OF REVOCATION OF ACCEPTANCE" dated January 30, 2004, which read in relevant part:

> The denial of the replacement and repairs to the Davis' vehicle is considered to be a breach of the warranty agreement and the defect in the vehicle substantially impairs the value of the vehicle to Mr. Davis. . . . You are hereby notified that Jessie Davis is revoking his acceptance of the Ford 150 Truck and demanding the refund of all of his payments or a substitution for the defective Ford 150 Truck.

Mr. Davis thereafter filed suit against Ford on July 8, 2004, averring the following claims: 1) revocation of acceptance; 2) breach of express warranty; 3) violation of the Tennessee Consumer Protection Act; 4) fraudulent misrepresentation; and 5) violation of the Magnuson-Moss Warranty Act. Ford raised several affirmative defenses in its answer, including "the defense of misuse, modification and/or abnormal use of the vehicle at issue, and/or failure to follow proper instructions or warnings . . . ." Ford also alleged that any problems with the truck were caused by acts or omissions beyond the scope of the warranty.

At trial, the parties stipulated that Mr. Davis could assert a claim under Tenn. Code Ann § 55-24-203, which was not originally pled.[1]

---

[1] Tenn. Code Ann. § 55-24-203 provides as follows:
> (a) The manufacturer must replace the motor vehicle with a comparable motor vehicle or accept return of the vehicle from the consumer and refund to the consumer the full purchase price if:
>
> (1) The nonconformity, defect or condition substantially impairs the motor vehicle; and

(continued...)

Mr. Davis described the trouble he experienced with the truck's excessive oil use. Mr. Davis testified that he had to change the truck's oil every 3,000 miles. As to the air filter, he testified that he cleaned it once. Because the truck was never repaired, Mr. Davis testified that he had to purchase two other vehicles.

Brandon Copeland, service manager for Blackwell Baldwin Ford testified concerning his knowledge of K & N air filters as follows:

> Q. Does a K & N filter require more particular service than an ordinary filter?
> A. A K & N filter, the ones that I come across are all - - you have to wash them out thoroughly, let them dry and you have to re-add an oil to it for it to work properly.
> Q. And if it doesn't work properly, what's the consequences?
> A. It's going to ingest dust, maybe a little bit of dirt, something like that. It's not going to filter the way it's supposed to.
> Q. And what's the consequences to the engine of operating a vehicle in that condition?
> A. If it ingests - - if it ingests an excessive amount of dust and dirt, it can damage the engine, as far as damage the cylinder or something like that.

As to the Magnaflow muffler, Truitt Davis, service director at Sunrise Pontiac GMC testified that a Magnaflow muffler is not Ford-issued, and that it has less back pressure than a Ford-issued muffler.

Mr. Davis called Russ Rasnic, a mechanical engineer, as an expert witness. Mr. Rasnic works for a consulting engineering company located in Arkansas. The following exchange occurred regarding Mr. Rasnic's experience:

> Q. Have you had experience in regard to investigations of failures of component parts on an engine?
> . . .

---

[1](...continued)
(2) The manufacturer, its agent or authorized dealer is unable to conform the motor vehicle to any applicable express warranty after a reasonable number of attempts.
. . .
(e) It shall be an affirmative defense to any claim under this part:
. . .
(2) That a nonconformity is the result of abuse, neglect or unauthorized modifications or alterations of a motor vehicle by a consumer.

A.      Yes. I actually have been kind of a shade-tree mechanic since about sixteen years old. I started a company for a guy who had a patent on a spark plug in 1999, and actually we manufactured the spark plug . . . . I did a lot of analysis of engines, combustion, the effects of burning inside the combustion chamber. There were cases where the spark plugs would fail, and I did analysis of those engines as well.

Mr. Rasnic testified as to the investigation he performed Mr. Davis' truck:

[M]y investigation centered on why was oil being burned in the combustion chamber.
     [F]irst of all, I drove the vehicle. I noticed that it was missing at idle. It seemed to run at highway speeds fine. Typically a miss means that one of your cylinders is misfiring somehow . . . .
. . .
 You should have very little buildup of anything on the spark plug if everything is working inside the combustion chamber correctly.
     There are eight plugs in this vehicle. . . . On three of the plugs out of the eight, there was significant deposits of oil . . . . One of those would have been the one that was causing the miss.
. . .
So, when I did this test, pour[ed] oil in the engine and redid the compression readings, they all came up, meaning the problem is in the cylinder, piston, piston ring area. That is where the oil is coming into the cylinder and the burning is causing the fouled spark plugs.

Mr. Rasnic also used a "Snap-On" diagnostic analyzer, which he explained as follows:

[This] read[s] the PCM [Power Control Module] parameters, the engine control module parameters, to see if there were any fault codes related to this type of [oil consumption] problem. What your on board computer will do is store codes of problems with components in the engine, and you can read them with what is called a Star Tech, you can read them with a Snap-On, you can read them with other aftermarket things as well, and it tells you where problem areas are. None of the codes I found in that related to anything to do with oil consumption or problems that would relate to the Superchip
. . . .

Mr. Rasnic explained the "super chip" as follows: "What a Superchip is, it basically has the same parameters that any other manufacturer puts into their engine, but it changes the parameters on some

of the things to give you more horsepower." He testified that he obtained his information about the super chip through speaking with the manufacturer of the chip.

Mr. Rasnic did not personally perform a diagnostic test, but he did watch a Ford employee run a diagnostic test on the truck. He testified that he and the Ford technician test drove the truck with Ford's Star Tech analyzer plugged into the truck, and the results indicated that all parameters were normal. He testified on cross examination that he was not trained in the use of the Star Tech equipment. Nor did he look at the cylinders on the truck during his inspection.

Mr. Rasnic testified that it was his opinion that the after-market components on Mr. Davis' truck "did not have any effect on the oil consumption causes in this engine." It was his opinion that the problem was "either one of those four things. You have a damaged ring. You have a ring alignment problem. You have a cylinder bore problem, or you have scored cylinder walls. . . . So it's a cylinder to piston ring interface problem of some sort of one of those four scenarios that I just gave you." It was his opinion that of these four possible causes, "they originated at the time the vehicle was manufactured, because they began showing at very low mileage." His conclusion was that after-market components would not affect the engine oil consumption.

Ford called their own expert witness, Tom Messerly. Mr. Messerly is a Ford field service engineer located in Memphis. Mr. Messerly has over 12 years of experience working for Ford. He testified that he is certified in ASE (Automotive Service Excellence), a "certification that's recognized nationwide in the automotive field for repair, [and] the diagnostics of automobile vehicles . . . ." Mr. Messerly inspected the truck on August 3, 2005. His relevant testimony is as follows:

> Q.    Okay. Could you just very briefly, by using the report or just telling the Judge and - - and us what you did and what you found?
> A.    I found an aftermarket air filter, which was the K & N filter. I believe it was excessively dirty. It hadn't been cleaned in a long time. I also checked the oil level of the truck and it was low, below the minimum specification.
>       The vehicle had been driven in by the customer for the inspection. I also found an aftermarket Magnaflow muffler on the vehicle, a super chip plugged into the manufacturer's, Ford Motor Company's computer system.
>       I also found several codes in the manufacturer's computer system which . . . [were] a vehicle speed sensor, battery voltage low and a turbo/supercharger overboost code. I also found that upon inspection that the vehicle did not come up as an F-150 Lightning. It came up as a Ford Ranger.
>
>       . . .

I put a piece of Ford diagnostic equipment on the vehicle. It's called a WDS, Worldwide Diagnostic Systems. It's a computer that reads the computer on the vehicle. And this is a diagnostic piece of equipment that technicians use on a regular basis - - Ford technicians.

. . .

In this particular case, it read this [truck's] computer thinking that it was a Ford Ranger. . . .

The one thing it did check and it came up with is an overboost code, meaning there was too much boost put into this vehicle.

Mr. Messerly explained "overboost" as follows:

The overboost is a code that Ford Motor Company puts into it [sic] system to be sure, puts the check engine light on to be sure that there's not too much boost pressure put into a cylinder when the vehicle is running down the road. Excessive amount of boost pressure can cause excessive amount of pressure in the cylinders, excessive amount of wear. It basically overloads the internal combustion engine, the engine itself, of the vehicle.

Mr. Messerly testified that the truck's computer "thought" it was a Ford Ranger, and thus used "different torque curves, different settings than our factory settings from Ford Motor Company." Mr. Messerly performed a compression test and testified he found none of the truck's cylinders to be extremely high or low.

Mr. Messerly described a K & N air filter as follows:

This is a cloth type of filter. A cloth filter relies on the oil that is put in the filter to trap large - - smaller particles and particles of dirt. That's the advantage of the K & N filter is that it allows more air flow into the engine. The downfall of that type of system is you have to maintain it very closely and you have to keep it oiled very, very well or else it will not trap particles of dirt.

Mr. Messerly testified that the excess dirt went through the throttle body of the truck, which "shows that there's been a lot of dirt go into the intake system."

As to the Magnaflow muffler, Mr. Messerly testified that it is a component added solely for "performance. It's to increase performance of the engine. It's to reduce the amount of back flow of an engine."

Mr. Messerly also testified as to the condition of the truck's tires:

> I inspected the tires on the vehicle . . . . [O]ne was at 2/32's, which is at the very minimum you're allowed to drive on the street with legally. And another tire was at 6/32's. The significance of that is typically because someone is spinning the tires or driving the vehicle very hard and the tires are being spun.
>
> . . .
>
> There was also a large amount of what we, the technician and I that was inspecting the vehicle, considered an excessive amount of acceleration, more than stock, more than normal.

After the completion of his inspection, including a borescope test, Mr. Messerly reached the following conclusion:

> My conclusion was that due to several factors, one of which is the aftermarket super chip increases the performance and the boost of the supercharger. [sic] They had a lot of excessive amount of air flow and dirt, a lot of dirt come in [sic] through the aftermarket air filter system. The muffler itself reduces the back pressure. And the vehicle was run below the minimum oil specifications. I feel it was not a factory defect that caused these problems, that caused the oil usage on the vehicle and that this was not a factory warrantable issue.

The trial court entered an order on May 8, 2007, finding in favor of Ford on all counts. The court specifically found that after the truck left Ford's control, the following after-market modifications occurred:

> 1. An aftermarket super chip [ ] had been plugged into the Truck's computer system to alter the engine parameter to increase the Truck's horsepower;
>
> 2. An aftermarket K&N Air Filtration System [ ] had been installed on the Truck to increase the amount of air in the engine and thus, increase its power; and
>
> 3. An aftermarket Magnaflow Muffler [ ] had been installed on the Truck to quiet the noise from the engine and increase its power.
>
> These products were neither manufactured nor installed by Ford. Furthermore, Ford and its dealerships recommend that Ford owners not install these on their vehicles due to warranty concerns.

-8-

The court found that these modifications were the cause of the truck's "nonconformities." The court based this on Mr. Messerly's expert testimony, and found that Mr. Davis' expert, Mr. Rasnic, lacked credibility. Based on these findings of fact, the court concluded that Ford "lived up to the terms of the Warranty and this Court must find in its favor."

## II. ISSUES PRESENTED

Mr. Davis presents four issues, but we have rephrased and consolidated the issues as follows:

1.      Whether Ford failed to prove by a preponderance of the evidence that the after-market modifications were the cause of the truck's nonconformities.

2.      Whether the trial court erred as a matter of law in determining that a buyer of a vehicle must have privity of contract with the manufacturer in order to revoke acceptance.

## III. STANDARD OF REVIEW

Our review of the trial court's factual findings made pursuant to a bench trial is *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d) (2007); ***Moody Realty Co., Inc. v. Huestis***, 237 S.W.3d 666, 673 (Tenn. Ct. App. 2007) (citing *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995)). We will only overturn these factual findings if the evidence preponderates against them. The evidence preponderates against a trial court's finding of fact when it supports "another finding of fact with greater convincing effect." ***Nashville Ford Tractor, Inc. v. Great American Ins. Co.***, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005); ***Watson v. Watson***, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). We do not apply a presumption of correctness, though, to the trial court's conclusions of law. ***Moody Realty Co., Inc.***, 237 S.W.3d at 673 (citing *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000)). Instead, our review is *de novo*. ***Troup v. Fischer Steel Corp.***, 236 S.W.3d 143, 146 (Tenn. 2007) (*citing Stewart v. Sewell*, 215 S.W.3d 815, 821 (Tenn. 2007)).

We give great weight to the trial court's factual findings concerning the credibility of witnesses, ***Nashville Ford Tractor, Inc.,*** 194 S.W.3d at 425 (citations omitted), and we will not re-evaluate these factual findings unless there exists clear and convincing evidence to the contrary. ***Sircy v. Metro. Gov't of Nashville and Davidson County***, 182 S.W.3d 815, 818 (Tenn. Ct. App. 2005) (citation omitted).

## IV. DISCUSSION

### A. Sufficiency of the Evidence - After-market Modifications

Mr. Davis argues that Ford failed to prove by a preponderance of the evidence that the truck's after-market modifications were the cause of the nonconformities. Mr. Davis further argues

that he proved a substantial manufacturing defect was present in the truck. Basically, Mr. Davis is arguing that the trial court erred by discrediting his expert witness, Mr. Rasnic, and accrediting Ford's expert witness, Mr. Messerly. We disagree.

The court specifically found that Mr. Rasnic lacked credibility:

> ### F. Plaintiffs' Expert Witness Lacked Credibility.
> [P]laintiffs employed Mr. Rasnic, an admitted "shade tree" mechanic, to inspect the Truck. Unlike Mr. Messerly, Mr. Rasnic possessed no experience in the automotive service field and was not a trained mechanic. He had never worked for an automobile manufacturer or dealer. Furthermore, his experience in inspecting and testifying about engines was limited to his inspection of a Chevrolet engine in a Model T.

The court also pointed out that Mr. Rasnic based his opinion on a test drive and his observation of a Ford service technician's performance of a borescope, but he did not perform the test "or even look into the cylinders after the test to verify its results. Despite his lack of participation, Mr. Rasnic testified that the results of this borescope supported his conclusion that the excessive oil consumption was a manufacturing defect." The court also noted that although Mr. Rasnic watched a Ford technician run a test using a Ford Star Tech analyzer, Mr. Rasnic was not trained nor had any experience with a Ford Star Tech analyzer.

The court concluded that Ford appropriately denied coverage under the warranty because "Ford successfully demonstrated that the Vehicle was equipped with several after-market modifications . . . and that these modifications caused the Truck's excessive oil consumption issues. Ford also established that Plaintiffs were driving the Truck with low oil and a dirty air filter."

As previously stated, we do not second-guess a trial court's determination of witness credibility absent clear and convincing evidence to the contrary. *See* **C & W Asset Acquisition, LLC v. Oggs**, 230 S.W.3d 671, 676 (Tenn. Ct. App. 2007); **ARC LifeMed, Inc. v. AMC-Tennessee, Inc.**, 183 S.W.3d 1, 24 (Tenn. Ct. App. 2005) ("One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations."). We agree with Ford's characterization of this case as a "battle of the experts." The trial court accepted Ford's expert's testimony that the after-market modifications caused the problems with Mr. Davis' truck. Mr. Davis restates in his brief Mr. Rasnic's testimony and his conclusion that the super chip and other modifications did not cause any of the truck's problems. Mr. Messerly's conclusion is the exact opposite, that the super chip, along with the other modifications, caused the truck's problems. "When expert testimony differs, it is within the discretion of the trial judge to determine which testimony to accept." **Bohanan v. City of Knoxville**, 136 S.W.3d 621, 624 (Tenn. 2004) (citing *Kellerman v. Food Lion, Inc.*, 929 S.W.2d 333, 335 (Tenn. Workers Comp. Panel 1996)); *see also* **Brown v. Crown Equipment Corp.**, 181 S.W.3d 268, 275 (Tenn. 2005) ("The weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact.").

Here, we have two competing explanations as to the cause of the truck's problems. The court chose not to believe Mr. Rasnic, due in part to his lack of experience with a Ford engine and the fact that Mr. Rasnic did not perform the tests. The trial court instead chose to accept Mr. Messerly's testimony as credible. We find no clear and convincing evidence to disturb this finding.

Mr. Davis argues that he proved that the truck had a substantial manufacturing defect, namely a "cylinder to piston ring interface problem." Mr. Davis also argues that Ford had the burden of proving that the after-market parts caused the truck's damage, and they did not met this burden. Again, these arguments hinge on the expert testimony, and as already stated, we will not disturb the trial court's ruling, as we are not in a position to second-guess the trial court's credibility determination.

### B. Privity of Contract

Mr. Davis argues that he effectively revoked his acceptance of the truck because he sent a letter of revocation to Ford. We next examine whether a buyer of a vehicle must have privity of contract with the manufacturer in order to revoke acceptance. This question has already been answered by our Supreme Court in the affirmative.

Tenn. Code Ann. § 47-2-608 provides a *buyer* with the remedy of revocation against the *seller*:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:
> (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
> (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
> . . .

Our Supreme Court, in *Kyker v. General Motors Corporation*, 214 Tenn. 521, 526–27, 381 S.W.2d 884, 886 (Tenn. 1964), addressed this exact issue of privity. In *Kyker*, the plaintiff sued the manufacturer of an allegedly defective vehicle, seeking the remedy of rescission. The dealer, whom the plaintiff purchased the vehicle from, was not an authorized dealer for General Motors Corporation. Our Supreme Court held that such a remedy was not available "as against a manufacturer who is not his immediate vendor or a party to the contract of sale." *Id.* at 886. To

-11-

hold otherwise, the Court reasoned, would "fl[y] in face of the very terms of the Act itself. The Act is couched in terms of 'buyer' and 'seller' and . . . it is intended to apply to only transactions between vendor and vendee and should not extend to the relations between a manufacturer, not a vendor, and the consumer." *Id.*

Subsequently, in ***Watts v. Mercedes-Benz USA, LLC***, No. E2007-00311-COA-R3-CV, 2007 WL 2700059, at *1 (Tenn. Ct. App. Sept. 17, 2007), the Eastern Section of this Court dealt with the same issue of whether a buyer is entitled to the remedy of revocation against the automobile distributor or manufacturer under a claim for breach of warranty and a claim under the Magnuson-Moss Warranty Act. The Court concluded that " the remedy of revocation of acceptance, previously known as rescission, is only available against the seller, not the distributor, of the product." The Court opined that "the application of common-sense reasoning persuades us that the buyer may only pursue a revocation of acceptance remedy against the seller, not a distributor who did not transfer title and to whom no purchase price was ever paid." *Id.* at *2.

Turning back to the present case, Ford was the manufacturer, and not the seller or distributor of the truck to Mr. Davis. Thus, from our discussion of the aforementioned case law, it is clear that the remedy of revocation of acceptance is not available against Ford.[2]

Mr. Davis also argues that the trial court erred in finding that privity of contract is required *to bring suit* against the manufacturer under Tenn. Code Ann. § 55-24-203 and the Magnuson-Moss Warranty Act. We agree with Ford that Mr. Davis has misstated the issue. We find no such ruling in the record. The trial court found that privity of contract is required *for revocation of acceptance*. As already discussed above, we have reached that same conclusion.

## V.  CONCLUSION

For the aforementioned reasons, we affirm. Costs of the appeal are assessed against Appellant, Jessie Davis and his surety, for which execution may issue if necessary.

ALAN E. HIGHERS, P.J., W.S.

---

[2] Because of the aforementioned holding, we need not determine whether Mr. Davis waived the right to revoke acceptance by his continued use of the truck after discovering the defects.